We have the first case today, 514-0141 Biggs v. Wyatt. Mr. Wendler. Good morning. May it please the court, I am Brian Wendler here on behalf of the Biggs family. We are requesting in this case a new trial on damages. This case involves an automobile accident that occurred on August 9, 2010 in Collinsville when Ms. Biggs stopped at a red light at the interstate exit on 157. And as she was sitting there waiting for the light to turn green, Ms. Wyatt's vehicle and Ms. Scheibel's vehicle, the two defendants' vehicles, collided. And then careened into Ms. Biggs' vehicle. The judge in the case, Judge Hiller, in the case, entered a ruling or instruction that my client, Ms. Biggs' fault is not an issue in the case due to the fact that there is no evidence implicating her for anything that she might have done wrong. Mr. Wendler, could you speak up just a little bit? Sure. That has nothing to do with amplifying. All right. So you have to do it yourself. So in this case, Ms. Biggs, she was on her way home from work. She, that evening, went to the emergency room and that's where her treatment started. She never actually went back to work after that because of her injuries. Her injuries included, as she claimed, severe headaches, contusion to the left elbow and right knee, C3-4 cervical disc bulge in the neck with anterior lumbar asthesis. I probably mispronounced that. Loss of the logotic curve in the cervical spine with spasm. She claimed an L4-5 lumbar aneurysm repair. She was diagnosed with strain of the cervical, thoracic, and lumbar spine. She claimed depression. She claimed a T3-4 bulge in post-traumatic syndrome. The jury in the case, throughout the exhibitions of the doctors and through the witnesses' testimony, has heard about various things that really have nothing to do with the issues, in this case, in terms of causation and or damages, including the jury got to hear about seasonal sinus headaches that Ms. Biggs had prior to the accident, scoliosis, carpal tunnel, degenerative disc disease, arthritis, vague references to back pain, and an unconfirmed possibility of a prior depression. Now, were those introduced through their expert? They were introduced through the experts and through the cross-examination of the treating doctors and also through Ms. Biggs' testimony on cross-examination as well. The issues that you believe were extraneous, were they tied up by any expert? No, those I don't think were tied up. There's one issue that was in the case, and that is the L4-5 annular tear. I concede that Dr. Randolph did, in fact, testify, my opinion, not very credibly, but he did testify that the L4-5 annular tear did preexist, predate the accident, and was, therefore, unrelated. So that's why I did not include that in the list of extraneous items that were interjected into the case. What part of her prior medical condition did you put into evidence on direct? That's an interesting, I'm glad you brought that up. We brought that up on direct examination because, and in opening statements too, because we knew, before going into trial, we knew that Judge Hill had already ruled on these issues in the pretrial conference, ruling on evidence deposition, questions of the doctors. So we knew it was coming in, and, therefore, rather than make it seem as if we're trying to hide it, we brought it out front and center right off the bat because we knew, or we already knew it was coming in through the depositions of the doctors. So, but specifically, which of those, the back, low back pain we brought out in opening and in direct examination, and I think that's all. So how is it that you believe you preserved, then, that error? Well, on that particular issue, it is our belief that we thought we had it preserved via an agreement and a stipulation through motion to eliminate hearings whereby we, I thought we had agreed that if you, if there's a ruling on motion to eliminate, we agreed that you would not have to object, and the court agreed with that. But in preparing for oral arguments this morning, I see that the motion to eliminate hearing is not part of the record in this case, so I can't rely on that. But our other point is, in a case like this where the judge has already ruled on what the jury is going to hear through unlimited rulings on depositions and page and line designations, we believe that the argument that you have to object and or you can't introduce it as part of your case in chief should be clarified so that issue, that ruling does not apply. And the reason for that argument is, the position is, the whole purpose of preserving the record and requiring this spontaneous or contemporaneous objection is so that the trial judge has the opportunity to rule, at the time, on the admissibility of the evidence. We already knew the evidence was coming in, so therefore the purpose of that rule requirement, the contemporaneous objection, had been satisfied. So our position is that, in this particular case, owing to the pretrial conference and the rulings by Judge Hill, that rule, at least the letter of spirit of the rule, had been satisfied. Turning to Ms. Bigg's prior condition, the evidence was undisputed that she had been returning from work the day of the accident. She had been going to school and working a full-time job for three years prior to the accident. There's really no question that she was not disabled. She was more than not disabled. She was going above and beyond by working a full-time job and studying to get her degree. At what age was she at the time of the accident? I want to say 47, but I can get you the specifics. That's okay, if that's a rough approximation. The testimony that we presented in the case was from Dr. Ali from Granite City, that Ms. Bigg's was disabled from employment as a result of the accident. The records from Dr. Kopiach's office also indicated that Ms. Bigg's was disabled. In the briefs that have been submitted by the defendants, it's been pointed out that there were three doctors who testified that Ms. Bigg's was not disabled after the accident. But that's not quite accurate. The three doctors that are identified are Dr. Gornett, who's a spine specialist, Dr. Rotman, who is an arms and carpal tunnel specialist in Dr. Gornett's office, and then we have Dr. Walsh, who's a chiropractor. Dr. Gornett said Ms. Bigg's could return to work from the perspective of the spine only, because that's all he saw her for on one occasion. Same for Dr. Rotman. He said she could return to work from the perspective of her arm condition only, and that's all he saw her for. Dr. Walsh did not say she could return to work. What he had in his file was a note that said he had expected a return to work date in December, but they never got there because Ms. Bigg's didn't follow up with treatment with him, so he never did release her to return to work. And the note that said the expected return to work date was not a return to work with no restrictions. He testified at page 999 to 1,000, and then 1,002 of the record that it was not a release for full duty and the restrictions were never lifted. He also said that at page 985. Dr. Randolph, on the other hand, testified for the defendant, Dr. Bernard Randolph. The panel is familiar with him, but it was established in his testimony through cross-examination that he earns $260,000 per year for doing medical-legal consultations, and he does that. He claimed that only constitutes 5% of his office time doing medical-legal consultations. He admitted doing 150 to 200 independent medical examinations per year. And this is his testimony in his evidence? In the trial evidence, yes, ma'am. The big issue that we have in this case is relating to the Social Security disability claim. At least from our perspective, we think this is the most important issue in the case. Ms. Bigg's case was set for trial on May 6, 2013. On May 2, she was notified that the Social Security office had approved her for Social Security disability, retroactive to the date of our accident in issue. When we learned of this, I immediately got a copy of the Social Security decision and faxed it or emailed it over to the defense counsel, and then I asked Judge Hill for a trial continuance due to this significant new development. That is important in this case because subsequently, well, actually on May 3, the same day that the document was produced, Ms. Walls filed a motion limiting to preclude any reference or use of that Social Security disability documentation. We ended up having a hearing on that motion limiting on July 24, at which time Judge Hill had granted the motion and entered an order precluding, quote, any witness to testify or mention indirectly that plaintiff has applied for or has been granted Social Security disability by the Social Security administration or that a determination has been made by the Social Security administration in favor of plaintiff. Now, that's the order that was entered by the court on July 24. I think at the time that the order was overbrought because it didn't leave any opportunity for impeachment, rebuttal, rehabilitation or anything, but that was the order that we were stuck with. We then proceeded to trial on October 15, and we were not allowed to use that Social Security disability award or make any reference to it at trial. We did make an offer of proof, but at the trial on cross-examination, both the defendants' counsel questioned Ms. Biggs as to why. They questioned her, not why, but they questioned her that she did not make any attempt to go find a job, did not make any attempt to return to work. Now, had she been actually released by these two doctors, Dr. Cornett and Rothman? Have I got the names right? Had she been released to return to work by? Dr. Cornett released her to return to work from the perspective of the spine. Right, you told me, and Dr. Rothman as well. Right. Now, Copias, the family doctor who was treating her for the overall body, did not release her to return to work. Okay. But the defendants' counsel asked questions at trial such as, you haven't applied for any jobs, you haven't gone out looking for a restaurant job, you have not applied at Wal-Mart, which everyone knows as the door greeter jobs. And when those questions were asked, we specifically approached the bench and asked for an opportunity to revisit that motion to eliminate ruling so that we could explain to the jury one of the reasons and most important reason at that point why Ms. Biggs had not gone out looking for work was because she had been found disabled, and if she had gone out on a job, a part-time, low-paying job, she would lose her only source of income and only source of medical coverage through Social Security. That was denied. We did, like I said, make an offer of proof that's in the record. The judge indicated that the Social Security – he first indicated he thought the Social Security disability finding was not related to the accident, but we pointed out on the record that it was, in fact, specifically related to and retroactive to the accident date. And that's on page 917. So, in your words, can you tell me for what purpose, then, you wanted to bring in the award? We wanted to bring it in pre-trial. We wanted to bring it in as evidence of the disability. And the judge said, no, you can't do that. Like I said, the order indicated we can't use it for any purpose. During trial, then, we wanted to bring that in at least to rebut the allegations that – the suggestions that Mrs. Biggs was malingering by not looking for work and to show her state of mind and course of conduct why she was not out there looking for work. And the obvious answer was it was financially devastating for her to do something like that, assuming, of course, she could find a job, which is not very likely. But that's what we wanted to bring it in for, not as substantive evidence, but as rehabilitation evidence at trial. But it was the judge's position, as it was the defense, that that was the whole controversy, essentially, in the case. I mean, it was obvious that they had caused an injury, and that wasn't disputed, but the extent of whether or not she was capable of working was the controversy at issue. That is correct. And how do you think that you could get in the fact that the Social Security Award stated that she couldn't work and not basically remove that from the jury's consideration? Well, I guess the problem lies in the fact that the defendants were allowed to ask questions about and suggest a malingering aspect of it. And to the extent the Social Security determination would have had to come in, it would have been because they had opened the door at that point. But it's a situation where we feel the defense were using the motion to eliminate as a sword rather than a shield in preventing us from giving the jury the whole story as to why Ms. Biggs was not out looking for work. I know there's cases dealing with collateral source rule, and this court in particular has been somewhat the front runner in acknowledging that in situations where insurance is generally not admissible at trial, but if a plaintiff is not going for medical treatment, if the plaintiff is allowed to explain to the jury it's because I don't have any medical insurance, this court has issued a couple of opinions along those lines. And we think this case is very much analogous. This court's opinions on those are the Van Nuysting case and the recent Brunchen v. DePalato-Pizza case. The authority that the defendants relied upon in securing the order from Judge Hall precluding any reference to the Social Security disability is first there was Evans v. Sisters, a third order. But in that case, Mr. Evans, the plaintiff, was claiming loss of mobility due to a malpractice claim, whereas earlier he had filed for Social Security disability only for his employability status, and his condition progressed after the alleged malpractice. But the holding in that case was it was not admissible for two reasons. One, the Social Security award would have interjected a collateral source, and two, Mr. Evans, the plaintiff, could not be expected to explain how an agency determines whether a claimant is totally disabled. In our case, there would have been no need for anyone to explain how someone is disabled. Ms. Biggs is only offering at that point to use the evidence, the award, to show why she had not been out looking for work. Again, we think that the defendants have opened the door. How would you have suggested that they had not opened the door? They could have suggested something like, well, Ms. Biggs, for the first six months after the accident you didn't look for work. The next year after the accident you didn't look for work. But they went past the date the Social Security disability award had been entered, and even then asked her, to the present time, you've not even applied for a job at Walmart, have you, and things like that. So they could have limited it to a specific time frame, but they didn't. The defendants, I think it's very interesting that they cited to the Orger versus Jane case, because in that case the plaintiff and her expert were permitted to testify regarding the Social Security disability award. And in that case the Social Security disability award was retroactive to the date of the accident, just like in our case. Now in the Orger case, the judge, and this is a New Jersey district court, he denied the admission of the actual introduction of the actual report, although the plaintiff and the plaintiff's expert was allowed to talk about it, he denied the admission of that report because it was, quote, cumulative, unquote, of the testimony of the expert and the plaintiff. Here, on the other hand, we would have been happy to have a ruling like the Orger court and let the plaintiff and or somebody testify about the Social Security disability award without necessarily introducing it into evidence. We cited, in our brief and in the trial court below, four cases in which the courts have allowed the use of Social Security disability awards. In all fairness, those were, as pointed out by defendants, cases that involve American Disabilities Act. Is my time up? I'm terribly sorry. I'll address my brief for the remainder. Unless there are any other questions? No, thank you. Do you intend to split your time? I guess I'm going to take ten minutes and Mr. Bortz is going to take ten minutes. If that's okay with the board. Do you have any other questions? No, not at all. I'll get through as much as I can in ten minutes. Thank you. May it please the court, Mr. Wingler, Mr. Bortz. My name is Tori Walz and I represent the defendant, Elizabeth Wyatt, in this case. Like I told you, counsel and I have decided to split our ten minutes, so I'm going to address some of the issues as much as I can, and Mr. Bortz is going to address some of the other issues. The first issue I'd like to address is the trial court's granting of the defendant's motion in limine excluding the social security disability report. Aside from the fact that the report itself was a hearsay, that the plaintiffs laid no foundation for it, that it violated the collateral source rule, that there were Rule 213 violations with regards to the report, we believe that the trial court correctly ruled that the prejudicial effect of admission in that report was substantially outweighed by its prejudicial effect. The cases that we decided in support of our argument that Mr. Wingler did discuss are the Evans v. Sisters of Third Order of St. Francis, which is a third district appellate court opinion out of Illinois, the Orver v. Jane decision, which is a U.S. district court decision out of New Jersey in 2012, and then the Johnson v. American Honda Motor Company decision. That's a U.S. district court decision out of Montana in 2012. We believe those cases are obstructive to the court on this issue and that the reasoning in those decisions is solid and should be applied to the facts in this case. Those three cases essentially state that there is a substantial risk of prejudice to a defendant if a social security disability determination such as the one in this case is admitted into evidence. And the cases, all three, point to the fact that during a social security administration hearing, there's a lack of a meaningful adversarial process with regards to the causation of the injury. The central inquiry in a social security administration inquiry is whether the person is disabled. It's not an inquiry as to what the cause of the disability is. There's no person, attorney, anybody at that hearing that is disputing causation like there is in a civil case such as this. Also, there is no basis for a jury to assess the qualifications of the administrative law judge in rendering opinions on causation in a social security administration court. Also, there's no basis for the jury to assess the qualifications of the doctors that have rendered opinions in those reports. Was the social security report consistent with what the doctors testified to? Did you get the whole report? We did, and I think there was, and I could be wrong on this because it wasn't something that I delved into too deeply. I think there was some testimony from some physicians that may have supported her position and then maybe one that didn't exactly support what the doctor said, what her doctor said at trial. So I think there was some dispute between them. I don't know that they were all exactly consistent. Do you think such a report could have been used for rebuttal if it would have been different? I do not, Your Honor, and because looking at the Johnson v. American Honda case, that case stated that because the report and its contents were prejudicial and the prejudicial effect outweighed the probative value, the report itself could not be admitted and any testimony referencing that report could not be admitted. Now, with regards to their argument that they should have been able to use the report in rebuttal, the plaintiffs concede in their brief that they were able to present expert testimony to prove she was disabled despite the social security disability report. So the disability report would have been cumulative. The plaintiff herself was allowed to testify that she had specific physical restrictions, that she couldn't do this or she couldn't do that, and she testified to those things. Also, Dr. Ali testified that he thought she was disabled. So the report didn't add anything more to that. It was just something to bolster the doctor's and the plaintiff's testimony. She was never denied the opportunity to explain why she couldn't go to work. She explained on the stand that she felt she couldn't because she was injured and because Dr. Ali told her she couldn't. So because the report is prejudicial and there's a very big risk of prejudice to the defendant and usurping the jury's function and determining causation, that report should not be admissible for any reason whatsoever. But you agree that this is a weighing or balancing process for the court to entertain. I do, and it's an abuse of discretion standard, and I think under the facts of the case that we don't believe that the court abused its discretion in this regard, especially because the plaintiff was given an opportunity to explain to the jury why she didn't go back to work. Mr. Wendler's suggestion that we limit our questions to a certain time period, like six months after the accident that she went to work, I think if we did that we would still be here today arguing with him about whether we open the door or not. I don't think that makes a difference. Did Dr. Coppius testify in any way? Dr. Coppius did not testify at the trial. If I remember correctly, his records may have been entered into evidence through a records custodian, but he provided no testimony at the trial. The only doctor that testified on behalf of the plaintiff at the trial was Dr. Ali. He was an expert or a treater? He was a treater. He was a treat neurologist. Okay. Dr. Rodman and Dr. O'Dell are also treaters of hers, but the defendants called them in their case of chief. And also, I'm sorry, the chiropractor did not testify on behalf of the plaintiff in the case. And he gave no opinion about returning to work? Well, like Mr. Wendler said in his records, he suggested that I think it was about four months after the accident. To go back to work, correct. I'm sorry, I didn't mean to interrupt you. Dr. Rodman said go back to work with regards to the elbow. Dr. Gornett, with regards to spines, said go back to work, or that she could return to work. And they released her from their care. The only one who testified at trial who said she was unable to work as a medical biller or coder was Dr. Ali. And Dr. Bernard Randolph, who was the defense medical expert, disputed that and said he felt she was able to go back to work based on her physical condition. The case was sided by plaintiffs in support of their arguments. Like Mr. Wendler said, they're all ADA cases, Americans with Disabilities Act and Rehabilitation Act cases. And none of those cases deal with disputes over causation of the disability. Those cases deal with a person who's disabled and whether they fit within the confines of the act some way or the other. There's no dispute over causation in those cases. So I don't believe that those cases provide any support for his argument in this case. Now, the one case Evans does not, though. Am I correct about that? Evans is a case that I sided. Yes. It does not deal ñ it's not an ADA case. No, and that's a case that I sided. Yeah, I understand. But he's also argued it. Well, I think in that case it was the plaintiff as opposed to the defendant who sought to exclude it. Right. But I think the reasoning can apply to the defendant. I don't think the reasoning in there is that because the issue of causation was vigorously contested, in reference to an agency's determination of somebody's disability, it would have deprived us of a fair trial if they were allowed to have that in there, because it's the jury's function to decide if she's disabled or not. I think moving on very quickly to the prior medical conditions, the plaintiff, Mr. Wendler, raised the issue of sinus headaches and scoliosis and carpal tunnel today. And I don't believe that those issues were specifically addressed in his brief, and I think that he ñ that they waived those arguments on appeal. The issues that they raised in their brief were that the defendant was allowed to, quote, interject arthritis and degenerative changes that were not caused by the accident, and they were allowed on the weekend in support of their argument. But under the weekend where a plaintiff opens the door to a specific testimony, they can't later complain that they were cross-examined on that testimony. And we believe that they opened the door to testimony with regards to her low back condition, a preexisting low back condition. Why do you believe that? During their opening statement, Mr. Wendler specifically told the jury that they're going to hear from Ms. Biggs that she had a prior low back injury, that she had it for years prior to the accident, that they were going to hear testimony that she was having symptoms in her low back the week before the accident. Were you trial counsel? I was. Okay. Was there some kind of stipulation made at the motion-eliminating hearing that that objection would be preserved? Honestly, I do not recall that ever being brought up by anybody. And in all fairness to Mr. Wendler, if it did, I don't recall it. And maybe Mr. Bortz can address that when he comes up here. But I do not recall that taking place. So back to him opening the door with regards to his statement, his major opening statement, I think he opened the door. And then the first witness that the plaintiff called on their behalf was a records custodian for Dr. Freeman, who was a psychologist who treated the plaintiff. The actual psychologist wasn't called, but the records custodian was to admit the records into evidence. And those records were admitted into evidence right after that witness's testimony. Those records indicated that the plaintiff had a history of a preexisting disc bulge in her low back. So I think through those records alone, those were admitted into evidence, and the plaintiff opened the door. And then also with the plaintiff's own testimony during direct examination. I mean, on direct examination, she testified about her preexisting disc bulge that was there for ten years, that she had been taking medication for for ten years up to the time of the accident. And also during my cross-examination and Mr. Bortz's cross-examination of Ms. Biggs, after plaintiff's counsel's questioning of her, we asked additional questions about her preexisting low back injury without any objection from plaintiff's counsel. So we believe that because he failed to object to our cross-examination, that also constitutes a waiver, that issue and the fact that he opened the door to that testimony. But even if this Court finds that he didn't open the door to the testimony, we believe that the evidence submitted at trial was sufficient to show causal connection between the preexisting low back injuries and the injuries she claimed from the accident. Under Boykin, if the Court finds that the jury can appraise the relationship between the preexisting injuries and the injuries from the accident without expert testimony, the Court can't find that, is what I'm trying to say. So basically, the argument is Ms. Biggs gave all this testimony and she had all these preexisting issues for ten years prior to the accident. She was having pain morning to night up to the day of the accident in her low back. And she testified on cross-examination without objection to all of that. We think that the plaintiff has waived the Boykin argument. And also that the jury could have appraised the relationship between the prior injuries and the subsequent injuries based on her testimony alone, that she had these ten years, which is a constant, morning to night, all the way from ten years from the accident back. So, but in addition... I'm not sure I understand your argument. Just because she can testify that she had pain in her back, you think the jury can relate that to Dr. Gornet's testimony? Well, under Boykin, if the trial court can find that the jury, based on the plaintiff's testimony, that the jury is able to appraise the prior and the subsequent injuries, and I'm just saying the trial court could have found that under these circumstances. But there's no evidence of that. Well, there's no ruling from the trial court to that effect. I'm just saying the trial court could have found that based on her testimony alone. But coupled with her testimony is Dr. Ali's testimony. He didn't equivocate. He conceded that she had preexisting degenerative changes in her cervical spine. He specifically conceded that those were caused by the normal aging process, and he specifically conceded that they were aggravated by the accident. So there's the connection between the preexisting neck and the claim injuries from the accident. And then also with regards to her lumbar pain, he also conceded that her preexisting lumbar pain was aggravated by the accident. And under Ford v. Grizzle, which is a Fifth District case, that's enough to make that connection there. So we believe that the trial court did not err in denying the plaintiff's motion to bar prior medical conditions. There's some additional arguments that the plaintiff has made regarding closing argument that was made by the defendant in the case. And they argued that my statement was prejudicial to them and improper. My statement was, and it was in response to something that Mr. Wendler said during direct ‑‑ I'm sorry, during his closing argument about our medical expert. And my statement was, now, as defendants in a lawsuit, we cannot speak to the plaintiff's doctors unless it's at a deposition with the plaintiff's counsel present. Their objection was it's a violation, but there was nothing more said. We approached the bench, and the court allowed the statement to stand. He asserts under the Netto v. Goldenberg case that that statement was prejudicial and improper. But it's up to the trial court to determine the effect of any prejudicial statements. And the Netto case that he cites in support of that argument, in that case, it doesn't even involve a closing argument. It involves the giving up the witness interview by an attorney instruction. And in that case, a modified instruction was given, adding language saying that the defendant cannot interview the treating physician or nurse. And the court found that that was misleading because it gave the jury the impression that the defendant didn't have equal access to the doctor. That case is distinguishable from our case because in our case, there was no modified jury instruction given. My statement to the jury was not misleading or a misstatement of the law in any way. My statement was just that the only time I can talk to the doctor is at a deposition with the plaintiff's counsel present. And it didn't misinform the jury in any way. And I didn't make any arguments that it gave me any type of advantage or that it gave the defendant any type of advantage. It was that statement, and then I moved on. So there could be no prejudice to the plaintiff as a result of that statement. And also, if there was a problem with that statement, the trial court cured any problem with that statement by giving an instruction that closing arguments are not evidence in the case. And the court has discretion and heard the testimony and considerable deference should be given to the trial court to determine whether that statement was prejudicial in the overall case. Lastly, the argument I want to address is the Verdict Form D. The plaintiff has argued that the Verdict Form D, it was air for that to go to the jury. But they've waived that argument completely because there was no objection made to Verdict Form D during the trial case whatsoever. So any arguments that the plaintiff has made with regards to Verdict Form D is waived. So at this point, I'll let Chris jump in and take over. Good morning. May it please the Court. Good morning. My name is Chris Bortz. I'm a lawyer for the other defendant in the case, Cheryl Scheibel. I just want to touch on a couple of things. I know at home I'm not going to retread on anything that Ms. Wallace has covered. But with respect to the Disability Award, one thing that I would add, and I don't think it's been mentioned yet, and that is that if the Disability Award were to be allowed into evidence and that a jury were to consider this disability finding, that would actually be cumulative, and that is another grounds for keeping it out. It would be cumulative because Dr. Ali, her treating neurologist, already provided an opinion that the plaintiff, Ms. Biggs, was in fact disabled. The other thing is that between the time that the Social Security Award issue came up in May, I believe, and the time that we argued that issue in July, I believe, there was never any sort of disclosure. There was never any Rule 213 disclosure. There was no formal identification of any witnesses that would be called, such as doctors that may have been involved in the process. So we believe that if it were allowed into evidence, it would have been a Rule 213 violation as well. Finally, with respect to one of Mr. Weller's arguments, and that is that he believes that this could come in under the business records rule. We believe that there was no foundation laid for the admissibility of the document itself. That being there was nobody called, no custodian, nobody familiar with the Social Security Department, called to lay a proper foundation, not only to authenticate the document, but to say the buzz words, the key words, that was kept in the ordinary course of business and so on. So we don't believe a foundation was even laid for admission of the rule. The other thing I wanted to tackle was the plaintiff's argument that the court erred in not allowing testimony from Dr. Randolph, who was our medical expert, when he was questioned about a testimony list that he did not produce at a prior deposition. The court, we objected to those questions in the evidence deposition of Dr. Randolph, and the trial court sustained our objections. The fact of the matter is that this issue arose in a completely different case. The testimony list, the list of testimony that Dr. Randolph had given, was sought by the counsel in that other case, and Dr. Randolph didn't bring it because he testified that he didn't think it was relevant. But the fact of the matter is that in our case, there was never any such request made of Dr. Randolph to bring a testimony list, and obviously that was not an issue in our case. It was a completely collateral matter, and we don't think that – what we believe is that Mr. Wendler was trying to sort of impeach Dr. Randolph with that testimony. However, I don't think that's a proper form of impeachment since, number one, he was never asked to bring such a list in our case. The bias effect that I think Mr. Wendler is saying that he missed out on was hammered home by him over an hour or so of grilling Dr. Randolph in his evidence deposition. You heard him mention here today briefly that he was able to get Dr. Randolph to testify about what he charges, what percentage of his time is devoted to medical legal work versus actually seeing patients. There was a clear bias argument made by Mr. Wendler at the trial of the case, and to suggest that because he didn't – the court didn't allow the jury to hear evidence of this witness list, to suggest that that didn't allow them to consider any bias that Dr. Randolph may have had in the case is incorrect, I believe. There are a couple jury issues – I'm sorry, juror issues to address. One is that there was a sleeping juror, so juror number 17 fell asleep. When we were doing the court here, we were facing – except for the lawyer that was asking the questions, some of the lawyers had their back to the jury. Obviously, Judge Hill was able to see the entire panel. And he noticed juror number 17 nodding off and falling asleep. Now, when juror 17 was questioned, obviously that came up. He was a store clerk, worked midnight shift. He was not happy to be there. He was obviously tired. And what happened is when he came back from the break, Judge Hill on his own basically said, listen, guys, I noticed juror 17, he's fallen asleep. And Judge Hill asked him some questions, and he testified that he did work the midnight shift. That he was tired, that it would interfere with his ability – I'm sorry, that it would – he would be tired if he were a jury member. And Judge Hill suggested that the juror be removed, and obviously we did not object to that. There are safety issues to consider. Judge Hill thought that it would be – there was a safety issue if this gentleman had to sit through a trial during the day and then drive home at night essentially having no sleep at all. This trial went four days, four solid days. The – Thank you. Thank you very much for your time. Mr. Wendler? Yes. Just a couple of points. With respect to the use of the Social Security Disability Award, we specifically offered and agreed to eliminate instruction so that there would not be any overuse or misuse of that award, but that offer was denied. And that's in the record? It is. I couldn't get you the specific – Well, we'll look – we'll see it in the record. The point was argued that we conceded that we had expert testimony on the disability. The only testimony that we had on that issue for life trial was Dr. Ali, the treating physician. I think the panel asked about that. In the briefing, it was pointed out that the defendants claimed they were surprised by the Social Security Disability Award when we ultimately produced it on May 3, the day after we got it – or the day we got it. But as it turns out, this case was actually set for trial in February of the same year. This is in the record. So once it was continued, did you disclose the award? They're talking about a 213 violation. Explain to me what your response is. That's an interesting argument because when the award was produced to the defendants the same day we produced it, Ms. Walls filed a motion in limine to preclude any use or reference to that award. Judge Hill actually held a hearing on that motion, I think it was in July, and granted the motion. So at that point, I guess we could have disclosed the people in the Social Security Award or disclosed the document itself, which we already produced, but the judge had already ruled we're not going to be able to use it for any purpose. So it would have been a futile exercise in futility to disclose that under Rule 213 at that point. There's no question. They had the actual document with all the doctors and persons identified in the report. There's no prejudice whatsoever. But I wanted to mention that we were set for trial in February of that year, and that trial was continued specifically because Mrs. Biggs had to be at the Social Security Administration to testify in the Social Security Administration hearing, which ultimately resulted in her award. So when the defendants claim this was all a surprise to them, that just is not true to the record. Is the award in the record as well? It is. It's in the record as a sealed exhibit, I believe. It is, okay. I can give you the specific citation if you'd like. Do you have it handy? I don't, but I can. No, we'll get it. Don't worry. Okay. The mention was made of the Ford v. Grizzle case. There's a later opinion by this Court, Noble v. Earl Jorgensen, that I think sheds some light on that case. We did not cite the Noble case in our brief, but I think it's very important and it's positive because this Court held that the defendant must have expert testimony to get any evidence of the other injuries or the prior condition, and must focus on the specific injury and not simply refer to, quote, low back pain, unquote, or a spinal treatment in general by a chiropractor. That's what happened here. Could you file a motion to supplement on that so that we do have that and an opposing counsel has an opportunity to view it and make any comments they want? Absolutely. Let's put a time limit on that so that we don't Ten days would be fine. Thank you. And ten days to respond, counsel. And that's related to the Noble case. Okay. Is that correct, Mr. Wendler? Yes, yes. Noble v. Earl M. Jorgensen Company, 213 Hill Ave., 5th, 120248. Dr. Randolph, the other case that he refused to produce the list in happened to be another case where defendant's counsel, the pre-arbitration office, was involved and he was asked to bring that list of testimony and didn't bring it because he thought it was not relevant. Now, I just want to clarify, and maybe I missed this, but was that raised again at the evidence? It was part of the evidence deposition of Dr. Randolph where I questioned him about that and Judge Hillis struck it from the record because At the evidence. I thought they were contending that all went on at the discovery and not at the evidence. The prior deposition was a discovery deposition from another case with Reed Armstrong Law Office. Dr. Randolph is a frequent flyer with their firm. So there was a connection. It's not just some arbitrary case that I asked him about this in a deposition. He didn't. Thank you. Thank you, Mr. Randolph. Thank you all for appearing today. This case will be taken under advisement and in order of relation, of course.